**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**ARTEMUS EDEN,**

             Plaintiff / Counter-Defendant,

   v.

**STATION TOWNHOUSES LLC, et al.,**

             Defendants / Counterclaimants

**Case No. 1:25-cv-02944**

---

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER**

The Court should deny Plaintiff's Emergency Motion for Temporary Restraining Order [ECF No. 6], construed as a motion seeking preliminary injunctive relief. Plaintiff Artemus Eden ("Eden") has not come close to carrying his burden to establish a ***likelihood*** of success on the merits; his case for irreparable harm is tenuous; and the balance of hardships and public interest weigh heavily against preliminary injunctive relief.

Eden is an alleged sex offender and convicted criminal who terrorized and harassed personnel and members of the community at the Station House Apartments ("Station House" or the "Property") for months before he was arrested and committed to psychiatric review at St. Elizabeths Hospital. For five months, he left his apartment vacant, permitted the D.C. Housing Authority to terminate his voucher without challenging the decision, made no attempt to obtain alternative approval for the apartment or to pay the balance, and was diagnosed as not competent to handle basic affairs (let alone to live in an independent living environment with hundreds of others). As a matter of law, Eden abandoned his rental unit.

But even if the Court disagrees on the merits of the eviction case, every other factor weighs against granting the extraordinary relief of a mandatory injunction.  If anything, the only irreparable harm to Eden would be to reinstate him in a vacant apartment unit with no supportive services, in a community where he has previously spiraled into delusion, threatened public officials, and faced incarceration due to violent sexual assaults.  Given the diagnoses he has received and the acts he has committed in his previous attempt to live at Station House, restoring him there only threatens further escalation and likely re-arrest and incarceration.

Additionally, the balance of the hardships and public interest clearly support maintaining Eden's absence from the community.  His bizarre and threatening behavior, and the likelihood of further incidents between him and the staff and residents, are ample reason for the Court to deny his extraordinary request for a mandatory injunction reinstating him to a unit for which he no longer qualifies.

To grant this motion would be to risk further physical harm to other residents and staff.  The Court instead should allow this case, like the overwhelming majority of civil suits, to play out through discovery, and then the jury can decide at the conclusion of the litigation whether Eden is entitled to any damages.  In the meantime, Eden can seek a safer living environment with appropriate support and treatment, as he has been receiving for nearly five months out of the apartment.  Denying this motion would permit a safer alternative for all parties.

**Factual Background**

Defendants provide the following factual background, which is drawn from Defendants' Counterclaim [ECF No. 12], and which Defendants will augment with live witness testimony at the September 11, 2025 preliminary injunction hearing.

### *Eden's Troubled Tenancy*

Station House is a luxury multifamily residential community located in the heart of the Atlas District.  Counterclaim ¶ 11.  The Property is home to families from diverse socioeconomic and professional backgrounds, and counts among its residents certain high-profile political figures, including United States Senators.  *Id.*

On or about March 13, 2020, Eden executed a lease agreement to reside in Unit 943 at Station House.  *Id.* ¶ 12.  During his time at Station House, Eden engaged in an escalating series of bizarre, threatening, and ultimately criminal acts.  *Id.* ¶ 13.  In June 2024, for instance, Eden paid multiple visits to the Station House management office and would lift his shirt to display his physical physique to the staff members.  Eden made unwanted advances toward the property manager, including by asking her, "where's my ring?"  *Id.* ¶ 14.  Eden also approached the overnight concierge on several occasions and tried to get her attention without any legitimate basis related to his residency.  *Id.* ¶ 15.  When the concierge asked Eden to cease this disruptive behavior, he would refuse and would make inappropriate comments about her body.  *Id.*  These interactions would last for minutes at a time, and over thirty minutes on at least one occasion.  *Id.*

On June 29, 2024, and again on July 23, 2024, Bozzuto Management Company ("BMC") personnel observed Eden harassing other residents, calling one fat and making a derogatory racial statement to another.  *Id.* ¶ 16.  Also in July 2024, Eden was charged in the D.C. Superior Court (Case No. 2024 CMD 007377) after a police officer encountered him "physically using both of his hands to hold onto a female," who was "attempting to struggle and physically break free from [his] grasp."  *Id.* ¶ 17 (quoting *Gerstein* affidavit, attached as **Exhibit 1**).  For reasons unknown to Counterclaimants, the Government subsequently nolle prossed the case.  *Id.*

951484

Eden's conduct only escalated from there.  In October 2024, BMC received a communication from the Director of Risk & Threat Management with the United States Senate Office of Security, Emergency Preparedness & Continuity, expressing concern about Eden's stalking of a U.S. Senator who resides at the Property.  A copy of that communication is attached as **Exhibit 2**.  In February 2025, U.S. Capitol Police brought to BMC's attention a disturbing flyer posted to the door of one of their protectees:



**Figure 1:  Eden's disturbing flyer**

On March 16, 2025, Eden approached the concierge desk and, as the concierge on duty handed him his mail, he flung three condoms at her and threatened to use the condoms to "f\*ck Bozzuto."  Counterclaim ¶ 20.  Surveillance video depicting the incident is located here: https://tinyurl.com/edenassault.

### *The March 2025 Sexual Assault*

Eden's conduct unfortunately escalated even further to an alleged violent sexual assault against a helpless person. On March 29, 2025, Eden was charged in the D.C. Superior Court, Case No. 2025 CF1 003418, with felony sex abuse in connection with "penetration of [his victim's] vulva with an object," where Eden "knew or had reason to know that [his victim] was incapable of appraising the nature of the conduct, incapable of declining participation in the sexual act, or incapable of communicating unwillingness to engage in that sexual act." Counterclaim ¶ 21 (quoting Complaint, attached as **Exhibit 3**). As set forth in the *Gerstein* affidavit, attached as **Exhibit 4**, Eden's victim was a homeless woman who had been staying with him temporarily. The affidavit reports that "on the morning of March 28, 2025, at approximately 5:40 am, she was awakened by a feeling of cold metal inside her vagina. *Id.* at 1. The complainant stated that she thought she was dreaming, however, when she awoke, she observed the defendant, having one hand on her lower bladder, just above her vagina, and the other hand inserting an unknown metal object inside her vagina." *Id.* According to the *Gerstein* affidavit, after the victim confronted Eden, he said, "I'm sorry…. I'msorry" [*sic*]; "continued to apologize"; and "began to act 'frantic.'" *Id.*

Eden's victim called the police. After law enforcement arrived at the Property, "without asking any questions, the defendant spontaneously uttered 'It's he said… she said.'" *Id.* at 2. Eden also confessed that the day prior, he had "engaged in masturbating while the complainant stood next to his bed fondling herself for him." *Id.*

As reflected on the public docket, Eden was jailed following the offense. On April 11, 2025, the Court "ordered the defendant be transferred to Saint Elizabeths Hospital for a full

competency evaluation."  For reasons unknown to Counterclaimants, the Government subsequently nolle prossed the case.  Counterclaim ¶ 26.

### *Eden's Legal Troubles Proliferate*

Eden's felony sexual assault of a homeless woman was just one of several offenses he is alleged to have committed this year.  In Case No. 2025 CMD 003196, Eden was charged in the D.C. Superior Court with unlawful entry on private property after making a threat to the chief of the Metropolitan Police Department and subsequently attempting to gain access to a police facility despite being barred from entry.  *Gerstein* Affidavit, attached as **Exhibit 5**.  The case resolved as part of a consolidated plea agreement in late August 2025.  Counterclaim ¶ 27.

In Case No. 2025 CMD 003414, Eden was charged in the D.C. Superior Court with simple assault and threats to do bodily harm after he invited a foreign visitor to his home, repeatedly caressed and fondled her without her consent, threatened to "rape" her, and also threatened to interfere with her efforts to return to the United States, as he ostensibly knows "influential people."  *Gerstein* Affidavit, attached as **Exhibit 6**.  For reasons unknown to Counterclaimants, the Government subsequently nolle prossed the case.  Counterclaim ¶ 28.

In Case No. 2025 CMD 003197, Eden was charged in the D.C. Superior Court with theft after he stole paperwork containing sensitive information about Station House tenants from the concierge desk.  *Gerstein* Affidavit, attached as **Exhibit 7**.  Eden's theft is depicted in surveillance camera footage, available at https://tinyurl.com/edentheft.  An image capturing the crime in action appears in Figure 2 below:

951484



**Figure 2:  Eden's theft of Station House records**

This case resolved as part of the consolidated plea agreement involving Case No. 2025

CMD 003196.  Counterclaim ¶ 30.

### *Eden's Abandonment of Unit 943*

From his arrest for felony sex abuse on March 28, 2025 through mid-August 2025, it

appears that Eden was in treatment/observation at St. Elizabeths.  Counterclaim ¶ 31.  A May 27,

2025 report of the Department of Behavioral Health, attached hereto as **Exhibit 8**, recommended

a finding of incompetency to stand trial, and included the following observations:

- Eden's "statements about his earlier history have most consistently and obviously been non-reality-based";

- Across up to thirty-two hospitalization or emergency room contacts and up to thirty-three ambulance contacts, Eden was diagnosed variously with bipolar spectrum illnesses, schizophrenia, minor neurocognitive disorder, and narcissistic personality disorder; and

- Eden "consistently presented as alternately paranoid and grandiose, with bizarre and disorganized thinking, and with grandiose, paranoid, and bizarre delusional thinking (i.e., non-reality-based thinking in spite of strong evidence to the contrary and with themes that were highly self-inflated, suspicious, and could not possibly be real)."

951484

*Id.* at 2-4.  Court records in Case No. 2025 CMD 003196 reflect that Eden was found incompetent in late May and again in late July.  Counterclaim ¶ 33.

On June 17, 2025, the attorney now representing Eden in this litigation, who had been retained by Eden in connection with certain eviction cases filed by BMC, wrote:  "Just a heads-up, Mr. Eden is still in the hospital. I expected him to be discharged a few weeks ago, but from what I've heard, he is still there."  June 17, 2025 email fr. N. Satterlund to C. Araviakis, attached as **Exhibit 9**.  On July 25, 2025, at a remote hearing in one of the eviction cases, the presiding judge asked Attorney Satterlund:  "I'm just trying to figure out, when are we going to be able to move forward with this case? Is there, kind of, an end in sight with respect to the continuances?"  Counterclaim ¶ 35.  Attorney Satterlund responded:  "I'm not exactly sure how to answer, Your Honor, given that there is a field of law at play that I don't have any experience in and can't offer a good predictive model."  *Id.* ¶ 36.

Thereafter, on August 1, 2025, Attorney Satterlund responded to a request from BMC's counsel for Eden to attend a case conference, advising that "if you want to include Mr. Eden, I'm happy to do so, but in that case we'd need to ask the court for a continuance-- he remains in the hospital."  Aug. 1, 2025 email fr. N. Satterlund to M. Brown, attached as **Exhibit 10**.  Ultimately, on August 19, 2025, Eden was deemed competent to stand trial, and his plea agreement in the theft and police stalking cases followed.  Counterclaim ¶ 38.

At no time during the five months between March 28, 2025 and August 28, 2025 did Eden return to Unit 943 or otherwise access the Property.  *See* Access History, attached as **Exhibit 11**.  At no time during the five months between March 28, 2025 and August 28, 2025 did Eden contact BMC and state that he intended to return to his unit, let alone provide the estimated date of any such return.  Counterclaim ¶ 40.

951484

On or about July 17, 2025, BMC received a Notice of HAP Contract Termination from the D.C. Housing Authority, attached as **Exhibit 12**, which advised that Eden's housing assistance was terminated retroactive to April 16, 2025 "due to violation(s) of HCVP rules and regulations." BMC previously had received notice, on or about March 12, 2025, of the potential termination and had been informed that Eden would receive an opportunity for an informal hearing. He evidently failed to take advantage of that opportunity. Counterclaim ¶ 42. At no time after that March 12, 2025 notice did Eden remit any payment to BMC for rent or utility costs, or seek to maintain his approval to continue to live in the unit. *Id.* ¶ 43.

With no sign of Eden on the premises, and with the knowledge that his voucher had been terminated, BMC entered the unit and found confirmatory evidence that it had not been lived in for some time and was in a terrible state of disarray. *Id.* ¶ 44. Figure 3 below depicts the severe cockroach infestation that had formed during Eden's long absence (if not earlier):

 

**Figure 3:  Eden's infested apartment**

BMC also discovered that Eden's van, which was parked in an adjacent garage, had become home to a family of cockroaches that were spreading throughout the garage and building. *Id.* ¶ 45.

Based on all the facts and circumstances, BMC determined that Eden had abandoned Unit 943 and was unlikely and unable to be able to resume his residency in the unit. *Id.* ¶ 46. BMC posted a notice of abandonment in the unit on July 23, 2025, and requested that Eden contact management by July 30 if he was still residing in the unit. A copy of the notice is attached as **Exhibit 13**.

Eden did not respond to the notice. Counterclaim ¶ 48. Accordingly, BMC retook possession and proceeded to turn the unit over for releasing. *Id.*

### *The September 2025 Trespass*

On August 28, 2025, following his plea deal, Eden returned to the Property for the first time in five months and attempted to access his former unit. *Id.* ¶ 49. Eden was not able to enter the unit, as the entry fob was recoded following the abandonment and unit turnover. *Id.* ¶ 50. He became disruptive and belligerent. *Id.*

On September 2, 2025, Eden again returned to the Property in the early hours of the morning. *Id.* ¶ 51. Officers with the Metropolitan Police Department were summoned to the Property, and they signed off on a barring notice, a copy of which is attached as **Exhibit 14**.

Despite his assaultive and criminal acts, and despite abandoning his unit for many months, Eden brought a wrongful eviction action against Station Townhouses and BMC in D.C. Superior Court, which BMC removed to this Court on September 1, 2025.

951484

## Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Appalachian Voices v. U.S. Envt'l Protection Agency*, No. 25-1982 (RJL), 2025 WL 2494905, at *3 (D.D.C. Aug. 29, 2025) (citation omitted). While at one time courts would apply a "sliding scale" approach, under which the movant need not make as strong a showing on one factor if they make an unusually strong showing on another factor, *Fed. Educ. Ass'n v. Trump*, No. 25-1362 (PLF), 2025 WL 2355747, at *7 (D.D.C. Aug. 14, 2025), *appeal docketed*, No. 25-5303 (D.C. Cir.), *Winter* "cast doubt on the propriety of that approach," and the D.C. Circuit has "suggested that a positive showing on all four preliminary injunction factors may be required," *Ahmed v. Noem*, No. 25-1351 (RBW), 2025 WL 2299447, at *7 (D.D.C. Aug. 8, 2025) (citations omitted).[1]

Where, as here, a movant seeks not to preserve the status quo, but instead to obtain a pretrial change in the status quo, the already heavy burden for the movant becomes heavier still. *See Democracy Forward Found. v. Office of Mgmt. & Budget*, 780 F. Supp. 3d 61, 72 (D.D.C. 2025) ("Mandatory preliminary injunctions are injunctions that 'alter, rather than preserve, the *status quo* by commanding some positive act.' '[J]udges on this Court have required the moving party to "meet a ***higher standard than in the ordinary case*** by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction."'" (emphasis added) (alteration in original) (citations omitted)). "The D.C. Circuit

---

[1] Eden's attorney referenced the outdated sliding scale approach in his motion, citing to cases that long predate *Winter*.

has expressly cautioned that '[t]he power to issue a preliminary injunction, ***especially a***

***mandatory one***, should be "***sparingly exercised***."'"  *Singh v. Carter*, 185 F. Supp. 3d 11, 17

(D.D.C. 2016) (emphases added) (citation omitted).  The D.C. Circuit also has cautioned "that a

preliminary injunction generally 'should not work to give a party essentially the full relief he

seeks on the merits.'"  *Id.* (citations omitted).  That admonition is apropos in this case, where the

principal relief Plaintiff seeks is reinstatement to his former apartment unit.

<u>Argument</u>

I.      **Eden is not likely to succeed on the merits of his claims, all of which stem from his erroneous allegation of a wrongful eviction.**

Eden cites *Int'l Commission on English in the Liturgy v. Schwartz*, 573 A.2d 1303 (D.C.

1990), as the legal support for his wrongful eviction claim.  Pl.'s Mot. at 6.  That is a curious

choice, because *Schwartz* is not primarily a wrongful eviction case; it is a wrongful abandonment

case, and the court recognized that "[w]hen tenants wrongfully abandon premises, landlords have

three options:  [1] [the landlords] could accept the abandonment and thereby terminate the lease;

[2] they could, without acquiescing in the abandonment, re-enter and relet and hold the tenants

for any deficiency in rent; or [3] they could refuse to re-enter, allow the premises to remain

vacant, and hold the tenants for the full rent."  *Id.* at 1306 (citations omitted).

Generally, the termination of a residential tenancy requires the tenant to provide the

housing provider at least 30 days' written notice of their intent to quit.  D.C. Code § 42-3202(b).

However, a tenancy may also be terminated if the tenant abandons the leased premises, in which

case, written notice is not required.  *See Simpson v. Lee*, 499 A.2d 889, 894 (D.C. 1985)

(considering whether, in the absence of the tenant providing the landlord written notice of his

intent to quit, the landlord "justifiably rel[ied] on [the tenant]'s silence after receiving the April

12, 1983 letter as evidence of his abandonment").

951484

"An abandonment occurs when a tenant leaves the premises vacant with the avowed intention not to be bound by his lease." *Id.* The determination of whether a tenant has abandoned their tenancy is highly fact-specific inquiry. *St. James Mut. Homes v. Andrade*, 951 A.2d 766, 772 (D.C. 2008) (*citing Thomas D. Walsh, Inc. v. Moore*, 141 A.2d 754, 755 (D.C. 1958) (finding that whether a tenant in fact abandoned his unit and, if so, whether the landlord accepted that abandonment is generally a question of fact)). Courts have characterized this inquiry as a "totality of the circumstances" test. *In re Steward*, 499 B.R. 557, 566 (Bankr. E.D. Mich. 2013).

The totality of the circumstances indicate that Eden had abandoned his apartment unit by July 17, 2025. On or about March 12, 2025, BMC learned that the D.C. Housing Authority (DCHA) was recommending termination of Eden's housing assistance through the Housing Voucher Program, and that Eden was being afforded an opportunity for an informal hearing to contest the recommendation. Counterclaim ¶ 42. Eden having apparently failed to request a hearing within the allotted timeframe, DCHA issued another letter on July 17, 2025 (**Exhibit 12**) terminating Eden's housing assistance retroactive to April 16, 2025. Eden apparently made no effort to maintain or secure the necessary approval from DCHA to continue his residency at Station House.

Nor did Eden obtain any alternative source of funding or attempt to maintain his rental obligations through another program. Defendants never received notice that Eden intended to pay for his housing through an alternative funding source, nor did they receive any communication regarding the payment of rent to maintain his residency at the community. Eden's intent not to be bound by the terms of his lease became clear when his benefits

951484

terminated and no alternative funding source was secured to support Eden's monthly rental obligations pursuant to the lease.

Beyond failing to secure funding to maintain his residency at Station House, Eden had not been seen at the property for months leading up to August 28, 2025. Station House concierge staff, who previously encountered Eden regularly, reported no sightings of him after his March 2025 arrest. Aff. of L. Isaacs ("Isaacs Aff.") ¶ 15. This is corroborated by records demonstrating that his key fob had not been used to access the community or his unit since March 28, 2025, indicating that he had not been present in the community at any time since then. **Exhibit 11**. Courts in other jurisdictions have held that a tenant's sporadic use of the leased premises may constitute evidence that the premises were not abandoned. *In re Stewart*, 499 B.R. at 566. The circumstances here are the exact opposite. There is no evidence that Eden ever set foot in the community—let alone his apartment unit—between March 28, 2025 and BMC's posting of the abandonment notice on July 23, 2025.

The state of Eden's apartment unit further reinforced BMC's belief that Eden had no intention of returning. BMC personnel entered the unit on May 8, 2025 due to a cockroach infestation originating from his unit, which had progressed to the point where cockroaches were spreading beyond Eden's unit and infiltrating other areas of the apartment community, including the units of other residents. Indeed, the infestation stemming from Eden's unit had become so severe that some residents chose to vacate the community altogether. Isaacs Aff. ¶ 16. Upon entering Eden's unit, BMC's personnel immediately discerned from the unit's condition that it had not been occupied for a prolonged period of time. *Id.* ¶¶ 17-18. Given the uninhabitable state of Eden's apartment, Defendants reasonably concluded that he had no intention of returning.

951484

On July 23, 2025, BMC posted a notice of abandonment on the inside of the apartment entrance door.  According to the notice, BMC determined that Eden had abandoned his apartment because he had not been seen at the property for a significant period of time, "ha[d] also not been responsive to recent communications, ha[d] been terminated from the DCHA voucher program, and ha[d] ceased complying with [his] rental obligations."  **Exhibit 13.**  The notice provided seven days for Eden to respond with his intent to return, but no response was received.

At no point did counsel for Eden provide any concrete information about Eden's plans with respect to the apartment.  Instead, counsel made vague representations, in communications about handling the pending eviction cases and meeting the procedural requirements of D.C. landlord-tenant law, to the effect that Eden was still hospitalized.  How long could Eden reasonably expect Defendants to hold his apartment unit—uninhabited for five months, rent payments having ceased, no sign of Eden in or around the community, and overrun by a roach infestation resulting in a risk to the health and safety of other residents—while awaiting Eden's return that might never have occurred?  Six months?  A year?  Two years?  Indefinitely?  While Eden's counsel has suggested that continued, indefinite hospitalization seemingly prevents a housing unit from becoming abandoned, the indefinite and uncertain nature of the hospitalization only supports that it was unlikely and unsafe for Eden to return.

Finally, Eden's diagnoses in his involuntary treatment program further reinforce the unlikelihood that he could ever safely return to an independent living environment with no supportive services, surrounded by other persons with whom he had questionable if not criminal interactions, and to whom he continues to harbor beliefs and hostility that are not soundly based in reality.  As noted above, the Department of Behavioral Health found that Eden has been

951484

diagnosed variously with bipolar spectrum illnesses, schizophrenia, minor neurocognitive disorder, and narcissistic personality disorder. **Exhibit 8**, at 2. He "consistently presented as alternately paranoid and grandiose, with bizarre and disorganized thinking, and with grandiose, paranoid, and bizarre delusional thinking." *Id.* at 4. Moreover, even after months of treatment and observation, the Department of Behavioral Health did not find Eden cured but instead opined that he was "**tenuously** **competent.**" Aug. 6, 2025 report at 7, attached as **Exhibit 15**. The report also notes that Eden's "lawyer has not responded to the undersigned's requests for consultation," such that "current findings have significant limitations." *Id.* That is hardly a resounding endorsement of Eden's ability to function in society. Simply put, this is not a person who is equipped to live alone in a community without sufficient mental health services and supports that Station House does not provide.

The law allows landlords to retake possession of leased premises that have been abandoned. Considering all of the circumstances outlined above, BMC reasonably concluded that Eden had no intention of returning to the apartment and lawfully retook possession.

Eden relies on *Mendes v. Johnson,* 389 A.2d 781 (D.C. 1978), to argue that landlords do not have a common law right of self-help. BMC did not engage in self-help; rather, BMC followed a lawful process in retaking possession of Eden's abandoned unit. The totality of the circumstances strongly suggests that Eden had abandoned the premises and had no intention of returning. ***At the very least***, a reasonable jury would have ample ground to find in Defendants' favor on this issue that, if the jury agrees with Defendants, would be dispositive of Eden's claims. That being so, Eden cannot carry his burden to establish likelihood of success on the merits for purposes of a mandatory preliminary injunction.

951484

Eden further argues that BMC could only retake possession of the unit if Eden provided written notice of his intent to abandon the apartment unit. First, we know this is not correct because of the analysis undertaken by the court in *Simpson*, 499 A.2d at 894 (evaluating whether, in the absence of the tenant providing the landlord written notice of his intent to quit, the landlord "justifiably rel[ied] on [the tenant]'s silence after receiving the April 12, 1983 letter as evidence of his abandonment"). Second, requiring written notice in the context of a tenant's abandonment of a unit is impractical. The very nature of abandonment involves the tenant ceasing all communication and effectively removing themselves from the premises. To impose a written notice requirement would defeat the purpose of the abandonment doctrine, which is designed to address situations where the tenant has relinquished possession of the premises with no intention of returning or ability to return. In these cases, strict adherence to written notice procedures is impractical if not meaningless since it presumes an ongoing line of communication between the landlord and tenant that no longer exists.

Clearly, there are many circumstances where a resident may abandon an apartment without providing explicit written intent. It is not uncommon in rental housing for a resident to "skip," leaving an apartment vacant or nearly vacant, and ceasing communications. Housing units may also be abandoned by death, incapacity, or criminal confinement or deportation. All of these fact patterns, which are not uncommon, amount to a commonsense definition of abandonment, and could not support Plaintiff's interpretation that explicit written notice is required.

Search-and-seizure case law provides a helpful analog here, as courts periodically are confronted with the question whether a tenant has abandoned his leasehold (and thus abandoned any reasonable expectation of privacy on the property). *See, e.g., Colón-Díaz v. United States*,

899 F. Supp. 2d 119, 130-31 (D.P.R. Sept. 20, 2012) (police were justified in searching apartment they believed to be abandoned based on condition of apartment, which "was in complete disarray with old, broken furniture and the appearance that the apartment had not been lived-in for some time"); *State v. Brauch*, 984 P.2d 703, 708-09 (Idaho 1999) ("Indicators of abandonment may include nonpayment of rent, removal of furniture, clothes, foodstuffs, and personal items, nonpayment or disconnection of utilities, statements to landlords or neighbors, and any other acts inconsistent with a tenant's control or occupation of the leased premises.").

Because Defendants reasonably concluded, based on the totality of the circumstances, that Eden had abandoned his unit as of the time Defendants received notice of the termination of Eden's benefits, Defendants had three options: "[1] [they] could accept the abandonment and thereby terminate the lease; [2] they could, without acquiescing in the abandonment, re-enter and relet and hold the tenants for any deficiency in rent; or [3] they could refuse to re-enter, allow the premises to remain vacant, and hold the tenants for the full rent." *Schwartz*, 573 A.2d at 1306 (quoting *Truitt v. Evangel Temple, Inc.*, 486 A.2d 1169, 1172 (D.C. 1984) (quoting *Cohen v. Food Town, Inc.*, 207 A.2d 122, 124 (D.C. 1965))). Defendants elected to accept the abandonment and prepare to re-lease the apartment unit to a prospective tenant, as they were entitled to do.

## II. Eden has not established a risk of irreparable harm.

Likelihood of irreparable harm, as with likelihood of success on the merits, presents a "high standard" for the movant. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025) (citation omitted). "'Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a' preliminary injunction 'are not enough.'" *Id.* (citation omitted). "And the 'possibility that adequate compensatory or other

951484

corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" *Id.* (citation omitted).

In a single paragraph in his motion, Eden argues that he is entitled to the extraordinary remedy of a mandatory preliminary injunction because he "has nowhere to go other than a homeless shelter."[2] Pl.'s Opp'n at 7. However, during the September 5, 2025 hearing, in which the Court denied Eden's request for a temporary restraining order, Eden appeared to be located in a safe, quiet room, and his counsel conceded that he has been staying with third parties at least some of the time. In the September 2, 2025 barring notice, Eden supplied the phone number of his "best friend." **Exhibit 14.** It is not obvious—and certainly not established by any evidence that Eden has submitted to date—that Eden actually faces an imminent loss of shelter. Moreover, it should come as no surprise to Eden that his tenancy at Station House would not continue indefinitely, given his abandonment of his unit and failure to appeal the termination of the voucher on which he had relied to pay his rent. *See Crossroads Residents Organized for Stable & Secure Residencies v. MSP Crossroads Apts. LLC*, No. 16-233 ADM/HB, 2016 WL 1555697, at *3 (D. Minn. Apr. 15, 2016) (denying preliminary injunction in housing discrimination case) ("Here, Plaintiffs are renters. Although they may have developed strong connections to their apartments and some have resided there for many years, their tenancy has always been subject to the terms of their leases.").

For his irreparable harm argument, Eden cites *Akassy v. William Penn Apartments LP*, 891 A.2d 291 (D.C. 2006), and *Lee v. Christian Coalition of America, Inc.*, 160 F. Supp. 2d 14 (D.D.C. 2001). Neither of these cases, which predate the sea change that *Winter* brought about,

---

[2] Eden also asserts, without evidence, that "the homeless population of the District of Columbia is being subjected to an externally directed, fast-moving, and unpredictable crackdown." Pl.'s Mot. at 7. Even if that is true, Eden does not contend that he himself has been subject to any such "crackdown," nor does he provide any information from which the Court could even consider this possibility as part of its analysis.

951484

are helpful to Eden.  *Lee* is not even an eviction case, it is an employment discrimination case and thus is not relevant.  And in *Akassy*, the tenant did not seek a preliminary injunction; rather, he sought (and obtained) a stay of an eviction.  Here, of course, Eden has no eviction to prevent, having abandoned his unit.  And unlike in this case, the court in *Akassy* found that "there was no showing that the landlord would be harmed."  891 A.2d at 310.  The court elaborated that "the tenant was directed to pay the full amount of rent demanded by the landlord pending appeal. Since the landlord would be protected from loss of income, its only harm would be the delay in executing the writ of eviction."  *Id.*  Here, by contrast, while Eden does owe Defendants thousands of dollars, money is the least of Defendants' concerns.  Defendants are primarily concerned about the safety and wellbeing of their employees and residents, who have been victimized by Eden.

In any case where a plaintiff alleges that a property or proprietary interest has been taken, the plaintiff might assert that the loss of that property or proprietary interest while litigation plays out is inconvenient—even harmful.  But every wrongful eviction or wrongful termination or conversion case could not give rise to a mandatory preliminary injunction, or these extraordinary remedies would become ordinary.  Generally, damages provide legally sufficient remedies for such claims.  *See Barel v. Fed. Nat'l Mortg. Ass'n*, No. 19-16054 (ES), 2019 WL 13213884, at *3 (D.N.J. Sept. 3, 2019) ("courts in this circuit have rejected the proposition 'that eviction from one's home necessarily constitutes irreparable harm,' because monetary compensations is an adequate remedy" (citations omitted)); *Stalker v. PHH Mortg. Corp.*, No. 4:13-cv-0807-DGK, 2013 WL 5306672, at *1 (W.D. Mo. Sept. 20, 2013) ("It appears to the Court that any wrongful eviction could be cured later by an order re-admitting Plaintiff to the property and awarding monetary damages to compensate him for the expense of living elsewhere until he is

re-admitted."); *Pimentel v. Deutsche Bank Nat'l Tr. Co.*, No. 09-CV-2264 JLS (NLS), 2009 WL 3398789, at *3 (S.D. Cal. Oct. 20, 2009) ("Regardless of whether foreclosure constitutes an irreparable harm, wrongful eviction from an unowned property can be compensated through monetary relief."); *Shoe Show of Rocky Mount, Inc. v. Palace Properties, L.L.C.*, No. 07-1315, 2007 WL 956512, at *4 (E.D. La. Mar. 28, 2007) ("the Court finds that a party who is injured by wrongful termination of a lease may be adequately compensated by monetary damages which can be calculated after a successful trial on the merits").

Finally, it is just as likely that "irreparable harm" would result to Eden if he were reinstated to his former apartment unit.  Station House is an independent living environment, in which Eden's last term of occupancy resulted in him losing mental capacity and committing acts of violence and sexual violence towards others, and being identified as a threat to United States Senators.  This previous occupancy led to incarceration and then involuntary medical treatment for an extended period of time.  The real irreparable harm to Eden may be to restore him to this powder keg of a living environment, without additional supportive services; such a result is highly likely to result in someone being hurt, and Eden suffering further decompensation and incarceration.

Plaintiff has not carried his heavy burden to establish a risk of irreparable harm in this case where, in the unlikely event he prevails on the merits, money damages could make him whole.

III.    **The balance of hardships and the public interest require the Court to deny preliminary injunctive relief that would reinstate a dangerous convict to a rental unit for which he no longer qualifies.**

Eden's case on the likelihood of success and irreparable harm prongs of the *Winter* analysis is not strong.  But as to the balance of hardships and public interest prongs, his case collapses.  Eden seemingly recognizes this, as he addresses these factors in a combined four

951484

sentences in his brief.  He asserts that the public interest does not favor self-help evictions (which did not occur here), and that being "bound to the due process of law is not a cognizable injury."  Pl.'s Mot. at 8.  What *is* a "cognizable injury" is a situation in which a violent criminal is ordered back onto a property where he has stalked United States Senators, harassed residents, threatened and assaulted staff, and stolen sensitive property.

The findings of the Department of Behavioral Health are telling.  Those findings, which twice resulted in Eden being held incompetent to stand trial, depict an individual in a deteriorated physical and mental state, who "consistently presented as alternately paranoid and grandiose, with bizarre and disorganized thinking, and with grandiose, paranoid, and bizarre delusional thinking."  **Exhibit 8**, at 4.  Eden also "showed signs of significant vulnerability to psychiatric decompensation."  *Id.* at 5.

Station House welcomes residents from different socioeconomic backgrounds and with different lifestyles and needs.  That said, the Property is not set up to provide intensive care for an individual experiencing an ongoing mental crisis—let alone in a unit for which the individual is not qualified and for which he will not pay rent.  Station House is not St. Elizabeths.  And based on a long and escalating series of incidents, the Court should presume that any return by Eden to the Property inevitably will result in more conflict, if not violence.  That likelihood outweighs any hardship to Eden in finding a new place to live (ideally one with the supports he requires to function in society).[3]

---

[3]  While the Court should not grant the preliminary injunctive relief that Eden seeks, if the Court is inclined to do so, it should require posting of an appropriate bond under Fed. R. Civ. P. 65(c). Defendants will incur significant costs in the event they are required to house Eden free of charge while this litigation plays out, and undoubtedly will incur still more costs once the unit is eventually cleaned out, given Eden's apparent inability to maintain a habitable living space.  Eden's monthly rent charge was $2,206, and BMC incurred $2,450 in cleanout costs during the unit turn earlier this year.  Given those facts, a reasonable bond would equal at least twelve months' worth of rent plus $2,000 for anticipated turnover costs, or approximately $28,500.

951484

**Conclusion**

The Court should deny Eden's request for preliminary injunctive relief.

Respectfully submitted,

**GALLAGHER EVELIUS & JONES LLP**

_____/s/ Joe Dugan_____
Christina F. Araviakis (Bar No. MD0203)
caraviakis@gejlaw.com
James D. Bragdon (Bar No. 1017743)
jbragdon@gejlaw.com
Joe Dugan (*pro hac vice*)
jdugan@gejlaw.com
Sangeetha Kannan (*pro hac vice*)
skannan@gejlaw.com
218 North Charles Street, Suite 400
Baltimore, MD  21201
Telephone: (410) 727-7702
Fax: (410) 468-2786
*Attorneys for Defendants*

Date:  September 9, 2025

**CERTIFICATE OF SERVICE**

I CERTIFY that on September 9, 2025, the foregoing Opposition, together with the exhibits and proposed order thereto, was served by CM/ECF on counsel of record and by email on Attorney Neil Satterlund.

_____/s/ Joe Dugan_____
Joe Dugan (*pro hac vice*)

951484