UNITED STATES DISTRICT COURT
for the DISTRICT OF COLUMBIA

| | |
|---|---|
| ARTEMUS EDEN,<br>        Plaintiff,<br><br>    v.<br><br>STATION TOWNHOUSES LLC and<br>BOZZUTO MANAGEMENT Co.,<br><br>        Defendants. | Case No. 1:25-cv-02944 |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Artemus Eden, via the undersigned counsel, replies as follows to Defendants' opposition to his motion seeking to be let back into his home.

As a matter of long-settled black-letter law in the District of Columbia, a landlord who wishes to evict a tenant has one remedy: the legislatively created remedy of seeking a writ by filing and winning a case in the Landlord and Tenant Branch of the Superior Court. *Mendes v. Johnson*, 389 A.2d 781 (D.C. 1978); *Simpson v. Lee*, 499 A.2d 889 (1985).

Defendants have been trying to evict Mr. Eden for a long time—they filed six cases against Artemus Eden over the course of 2024 and 2025. Defendants, via counsel, opposed Mr. Eden's request for a continuance at the July 25, 2025 hearing in 2025-LTB-004118, since they felt it was taking too long to obtain this exclusive remedy while Mr. Eden was in the hospital.

Then, Defendants changed the locks. When Mr. Eden learned about this, and objected to having been made homeless, Defendants characterized his behavior as combative and threatened to have him arrested if he kept trying to enter his home.

Defendants then committed to the notion that they had believed Mr. Eden had abandoned the apartment.

1

But Defendants begin their briefing, not by trying to explain why they thought Mr. Eden was never coming back, but by launching into an explanation of "Eden's Troubled Tenancy," in support of their actual argument: that they should be allowed this one self-help eviction as a freebie, because of how much they wanted to do it.

This results in some rather odd formulations in the Opposition. Defendants rehash the fact that Mr. Eden was in treatment/observation at St. Elizabeth's from March 28, 2025 through mid-August 2025 (Opp. at 7), then profess to have been confused that "[a]t no time during the five months between March 28, 2025 and August 28, 2025 did Eden return to Unit 943 or otherwise access the Property." (Opp. at 8). Defendants describe multiple cases they filed, in which the only remedy they were seeking was possession of the unit, and accurately recount discussions they were having with me about the timing of hearings and a pretrial conference in several of these cases. Then, Defendants blame their victim for his eviction, saying that "[a]t no time during the five months between March 28, 2025 and August 28, 2025 did Eden contact BMC and state that he intended to return to his unit, let alone provide the estimated date of any such return." Opp at 8. But this isn't true. He said that he intended to return to his unit over and over, because a tenant who did not intend to return to his unit would have no reason whatsoever to maintain a defense against a lease violation case. A tenant who abandons his claim to return to the unit has, as a matter of law, rendered the case against him moot, and need only point this out and rest easily. *See Atkins v. United States*, 283 A.2d 204 (D.C. 1971).

Mr. Eden also proffers his testimony, which he will deliver under oath tomorrow, that he did not in fact "receive an opportunity for an informal hearing" before his voucher was terminated. Opp. at 9. He did not receive the notice of voucher termination before he lost access to the property. His voucher provider, Pathways to Housing, reports that they did not receive

2

actual notice of the proposed termination until after the July 17, 2025 Notice of HAP Contract Termination was issued. Mr. Eden has spent much of the day today requesting documents connected to the termination of his voucher (which, he suspects, may include communications from Defendants to the D.C. Housing Authority seeking to *initiate* the voucher termination, presumably for the purpose of creating a new cause of action to try to evict him). Mr. Eden has also asked for a fair hearing, which is the first step in the administrative process of challenging the voucher termination in the hope of restoring funding to Defendants. This hearing will likely take place in the next few weeks. [1]

### A. Plaintiff is Likely to Succeed on the Merits

The only question presented, as to Plaintiff's likelihood of success on the merits of his claim, is: can one, as a matter of law, abandon a tenancy—such that one's landlord has the lawful right to throw away all of one's possessions, change the locks, and bar one from one's home under threat of arrest—by being absent from one's apartment for a time while not knowing when one will be able to return?

This question must be considered in the light of Defendants' grave reluctance (shared by many unscrupulous landlords in the District of Columbia) to wait for the legal process to take its course before they could be rid of a tenant they found undesirable. This is why the District of Columbia has strong protections for tenants' rights in the first place— the abrogation of the right of self-help eviction, "A residential tenancy from month-to-month may be terminated by a 30-day notice **in writing only from the tenant to the housing provider** of the tenant's intention to

---

[1] Mr. Eden also notes in passing that Defendants told this Court last week that they were pretty sure they were exposed to $75,000 or more in money damages. If it were true that "the principal relief Plaintiff seeks" in this case was "reinstatement to his former apartment unit" (Opp. at 12), then Defendants would have no valid claim on the jurisdiction of this Court.

quit." D.C. Code § 42-3505.54(a) (emphasis added). The Court of Appeals has emphasized that "[a] written notice requirement reduces the possibility of misunderstanding between landlord and tenant. Furthermore, should disagreements arise as to the parties' intentions, adjudication will be less difficult if the court is able to turn to a written document rather than having to rely on the parties' recollections of conversations." *Burns v. Harvey*, 524 A.2d 35, 37 (D.C. 1987).

> **i.** <u>Abandonment Requires Intent and Action</u>

Defendants are correct that abandonment of a tenancy requires a fact-specific determination, in view of the totality of the circumstances. (Opp at 13). But the determination to be made is not "does the landlord know a date certain by which the tenant will be back?" As the Court of Appeals has held, "the term 'abandon' does require the specific intent to relinquish or give up a right or interest; it includes the intention, and also the external act by which it is carried into effect. Hence 'abandonment' is defined to mean 'vacating property with the intention of not returning.'" *Saul Subsidiary II Ltd. Partnership v. Venator Group Specialty, Inc.*, 830 A.2d 854 (D.C. 2003) (*citing* BLACK'S LAW DICTIONARY 4 (3d ed. 1933)). This is a question of fact—has the tenant taken acts to carry into effect an intention to leave and never come back? It is not a question of the landlord's subjective state of mind. *See also St. James Mut. Homes v. Andrade*, 951 A.2d 766, 772 (D.C. 2008) (it was "essential" for the trial court to "determine whether Mr. Andrade did in fact abandon his unit…")

> **ii.** <u>The Totality of the Circumstances Established No Such Thing.</u>

Nothing Defendants offer comes close to showing that, as a matter of fact, Mr. Eden formed and then acted on the intention of giving up his home. He left his property there. He was, as Defendants knew, gone against his will. His absence was of an uncertain duration, but it was

4

abundantly clear that he intended to come back as soon as he could, since he was continuing to participate in the defense of his tenancy on six fronts.

Obviously, Mr. Eden, who reports no supernatural power of clairvoyance, did not generate any evidence of his intentions by failing to respond within seven days to a July 23, 2025 notice posted "on the inside of the apartment entrance door," a span of time for which Defendants knew that Plaintiff was in the hospital. (Opp. at 15).

Defendants argue, in effect, that Mr. Eden abandoned his tenancy by being confined to hospital and not knowing when he would be able to return to his home. But Defendants, despite having apparently conducted a very broad and thorough search, flooding the banks of the civil law of the other fifty states to examine the criminal procedure of Puerto Rico, have not offered any authority in support of the notion that *some* possible indicia of abandonment (such as nonpayment of rent or a messy home) will allow a landlord to deem a tenancy to have been abandoned, even in the face of other clear evidence that the tenancy has *not* been abandoned. Plaintiff's counsel, as Defendants note, sent Defendants, "communications about handling the pending eviction cases and meeting the procedural requirements of D.C. landlord-tenant law, to the effect that [Mr.] Eden was still hospitalized." (Opp. at 15). As Defendants say, therefore, Mr. Eden, speaking through his counsel, was still "handling the pending eviction cases." Mr. Eden, via counsel, responded to Defendants on August 1, 2025 about the scheduling of a meeting to be held before the pretrial conference scheduled for September 3, 2025 in 2024-LTB-8617.[2] Mr. Eden was not even seeking any delay in the case that was almost ready for trial. Defendants had asked Plaintiff's counsel for time to meet with "you and your client" (Def. Exh. 10 at p. 2.), even

---

[2] This pretrial had been originally scheduled for May 15, 2025, but Plaintiff consented to Defendants' request for a continuance. Defendants' Exhibit 10 at p. 5.

though, as Defendants presumably knew, D.C. R. Civ. P. 16(c)(1) requires only a meeting between "at least one of the attorneys who will conduct the trial for each of the parties, and any unrepresented parties." Mr. Eden, having no objection to the unusual request that both the attorney and the represented party attend the required meeting, offered Defendants their choice of either, via his counsel's reply: "if you want to include Mr. Eden, I'm happy to do so, but in that case we'd need to ask the court for a continuance—he remains in the hospital. I'm also happy to meet just between you and me. My schedule is wide open Monday the 4th…" *Id.* at pp. 1-2. Defendants did not respond, other than by filing a praecipe to dismiss the case, without prejudice or explanation, on August 25, 2025.

Defendants are chasing a red herring when they argue that the tenancy was abandoned when the HAP contract was terminated. Defendants' Exhibit 12 is *dated* July 17, 2025, and headed to suggest that it was sent via mail. It is unclear when Defendants actually received this notice (which, obviously, Plaintiff did not receive at all, since he was in the hospital). But it can't have been long between Defendants' receipt of the notice, and Defendants' determination to post a "notice of abandonment" inside the apartment, which happened, according to Defendants, on July 23, 2025. It is of no moment that, four business days after DCHA dated the Notice of Termination, "no alternative funding source was secured to support Eden's monthly rental obligations pursuant to the lease."[3] (Opp. at 14). Because, again, a HAP contract termination does not have the legal the effect of terminating a tenancy. This termination did not give Defendants their desired end-run around the laws governing a tenant's rights. Rather, the

---

[3] Defendants refer to Plaintiff by the mononym "Eden" throughout their briefing. I hope that going forward, notwithstanding Defendants' views of Plaintiff as a person, they will trouble themselves, at the very least during formal court proceedings, to adopt some less rude way of referring to Mr. Eden.

6

regulations require that "[a]ny Owner termination of tenancy must be consistent with the District of Columbia Rental Housing Act and any other D.C. law governing landlord-tenant relations." 14 DCMR 5802.4. Meaning, even if Defendants did not receive rent on Mr. Eden's behalf in August, their exclusive remedy was serving Mr. Eden with notice of this fact and a thirty-day opportunity to cure, followed by filing suit seeking his lawful eviction for nonpayment of rent.

Plaintiff does not know—but respectfully submits that he does not need to know—how long a D.C. tenant "could… reasonably expect" (Opp. at 15) their landlord to wait, before concluding that the tenant ***did not intend*** to ever return. As Defendants themselves note, "[t]he very nature of abandonment involves the tenant ceasing all communication and effectively removing themselves from the premises." (Opp. at 17). This never happened. As Defendants concede, they never lost contact with Plaintiff—they were in regular contact with him, via his designated agent: me. And all of our communications were about Mr. Eden's defense of all six of Defendants' eviction lawsuits—which is to say that all of our communications were focused on Mr. Eden's defense of his right (and, thus, proof of his intention) to return to his home as soon as he was able.

### B. Wrongful Eviction is Still Irreparable Injury

Mr. Eden previously devoted only a brief discussion to the question of irreparable harm, because the question is not a close one under District of Columbia law. As this Court has held, even when a wrongful eviction was merely threatened, "Plaintiffs have clearly established that if the injunction is not issued they will be irreparably harmed. It is axiomatic that wrongful eviction

constitutes irreparable injury." *Brown v. Artery Organization, Inc.*, 654 F.Supp. 1106, 1118 (D.D.C. 1987).[4]

Mr. Eden declines to dignify with any response Defendants' brazen argument that Mr. Eden must not be harmed by becoming homeless because it appears that he has access to "a safe, quiet room" for a few minutes during the day, or enough funds to occasionally stay at a youth hostel instead of a homeless shelter, or a "best friend." (Opp. at 19). Likewise, Mr. Eden need not address Defendants' argument, disingenuously paternalistic as well as brazen, that they illegally evicted Mr. Eden for his own good (Opp. at 21).

### C. The Balance of Harms and Public Interest Favor Restoring the Status Quo

Mr. Eden cannot agree with Defendants' notion that living or working in the same building as him causes harm sufficient to outweigh the harm of being made homeless.

If this Court entertains any doubts on this point, Mr. Eden proffers his testimony, subject to Defendants' cross-examination tomorrow, that he has medication and support in handling his mental health, such that there is no compelling need for the Court to sign off on Defendants' determination that he is an outlaw.

Defendants argue that Mr. Eden should face a higher standard of review since he seeks to "alter, rather than preserve, the *status quo*…" Opp. at 11. This is particularly unblushing of them, since Defendants *recently caused* the new status quo they now want to preserve, by breaking the law. Having accomplished their long-sought goal of evicting Mr. Eden by their own resort to self-help, they now ask to profit from their wrongdoing by getting the more favorable standard.

---

[4] Defendants' desultory gesture to *Winter* (Opp. at 19) does nothing to help them. *Winter* required a showing of irreparable injury to be likely, "not just a possibility." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21 (2008). Here, *a fortiori*, irreparable injury is "axiomatic." If Defendants believe that their cited authority has changed the law of the District of Columbia concerning the harmfulness of wrongful eviction, they have failed to explain how or why.

Under Defendants' preferred vision of the law, a bully can walk up, trample the kid at the front of the line, take the kid's place, and then, when the kid seeks to be restored to his former place, argue that the bully must be allowed to go first, absent some extraordinary showing, in order to preserve the (newly created) *status quo* that the bully is first in line.

Mr. Eden also notes that Defendants had a remedy available, to have their day in court as to all of the tremendous harm that, they insist, Mr. Eden's mere presence inflicts on the world. Defendants are well versed in, and were pursuing, that remedy— by filing all of the allegations they bundle together in their Opposition, subdivided among six different eviction lawsuits. One of these suits, concerning utility bills, was dismissed by the court on Mr. Eden's motion. But Defendants voluntarily abandoned the other five once they caught sight of what they believed to be a shortcut.

All those abandoned remedies (which, again, were the legislatively created, exclusive way for Defendants to legally get their way in this) are still available to Defendants. Mr. Eden is not seeking, and knows that this Court could likely not order, an injunction that would immunize him from any future legal process. He only wants this Court to order Defendants to obey the law. If Defendants are unhappy about having to restart the clock on the due process of law, starting over from an initial filing rather than moving forward from the pretrial conference originally scheduled for May 15, 2025, that is entirely the result of Defendants' own decisions. They asked to continue that pretrial. Then they dismissed that case, voluntarily abandoning their available remedy. Plaintiff respectfully submits that equity should disfavor saving Defendants from their own poor decision-making.

Defendants are proposing a dangerous erosion of the District of Columbia's strong bulwark against self-help eviction. Tenants are, and should be, free to come and go from their

homes, even if their landlord does not like them and they have to leave without knowing the exact date on which they will return. Defendants are asking for a huge modification of the law, whereby a landlord who badly wants to kick out a tenant, and does not want to obey the law designed to guarantee the tenant his day in court, can adopt a willful blindness against clear evidence of the tenant's intent to return as soon as possible, deem the tenancy abandoned because the place is messy and the rent is four days late, throw away all of the tenant's stuff, and drive the tenant away under the threat of arrest (*see* Defendants' Exhibit 14) once the tenant returns and objects.

Such a law would not be in the public interest of the District of Columbia.

**Conclusion**

The District of Columbia's rule is that a month to month tenancy can only be terminated by the tenant, or by the U.S. marshals. Even abandonment requires intent manifested by action—from the tenant. Defendants propose a host of exceptions to this rule, that they urge should allow the landlord to terminate a tenancy un-aided: the tenant's hospitalization for an uncertain term. Diagnosis with one or more psychiatric conditions which might benefit from community support. Failure to respond to notices mailed or posted to places where the landlord knows the tenant cannot see them. Cockroaches. Nonpayment of rent.[5] Circumstances that would permit Puerto Rican law enforcement to conduct a warrantless search. But Defendants have found no support for any of these proposed exceptions in the actual law that governs tenancies in the District of Columbia. Nor, despite diligently conducting his own search, has Mr. Eden found any.

---

[5] Or, rather, a rumor of future nonpayment of rent—since, even if Defendants somehow received the notice that the HAP contract had been terminated the same day that the District of Columbia Housing Authority put it in the mail, they waited at most four business days before posting notice that they planned to deem the tenancy abandoned.

10

Defendants knew perfectly well that Mr. Eden had no intention of abandoning his tenancy. Proof of his intent to the contrary was arriving every few weeks, whenever the parties had to communicate in the course of Defendants' six lawsuits seeking Mr. Eden's eviction. Defendants, regardless, wanted to change the locks and throw away Mr. Eden's stuff, and thought that they could get away with it.

Any right that can be abrogated by a more powerful entity, just because that entity thinks the holder of that right is kind of a pain, does not actually exist in any way that matters.

Now, Mr. Eden is homeless. If this Court does not grant the requested relief, Mr. Eden is not in a position to just go find a new place to rent somewhere nearby. He still has to work his way through an administrative challenge before he can get his voucher restored, and even once that happens it can take weeks or months to secure approval to transfer a voucher to a new property. He needs, and respectfully asks for, this Court's help to undo Defendants' illegal self-help eviction.

Respectfully submitted,

September 10, 2025

Neil Colin Satterlund, D.C. Bar #1531473
Neighborhood Legal Services Program
*Counsel for Plaintiff*
64 New York Ave NE, Suite 180
Washington, DC 20002
(202) 849-3609
NSatterlund@nlsp.org

## CERTIFICATE OF SERVICE

I hereby certify that today, September 10, 2025, I am electronically filing a copy of the foregoing REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (with the kind assistance of my supervisor, Rachel Weiss). I will then send a courtesy copy to Defendants via their counsel of record by email.

Respectfully Submitted,

Neil Colin Satterlund #1531473
Neighborhood Legal Services Program
64 New York Ave. NE, Suite 180
Washington, DC 20002
NSatterlund@NLSP.org, (202)849-3609
*Counsel for Plaintiff*