**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **ARTEMUS EDEN.** )  )  **Plaintiffs,** )  )  v. )  )  **STATION TOWNHOUSES LLC, et al.** )  )  **Defendants.** ) ) | Civil No. 25-cv-02944 (APM) |

## NOTICE

Mr. Eden seeks an order of injunctive relief that would require Defendants to permit him to enter and to reside in an apartment that he first leased in March 2020 at a residential complex named Station House in NE DC. The relevant facts on the merits are these.

On March 28, 2025, Mr. Eden was arrested for an alleged sexual assault committed inside the apartment. Mr. Eden was presented to a magistrate judge on that charge. The record is unclear about what precisely happened upon his appearance, but what is clear is that Mr. Eden was not immediately released and, at some point, during either those proceedings or other criminal proceedings, he was evaluated for competency to stand trial and determined not competent. He was remanded to St. Elizabeth's to regain competency. This competency restoration period lasted at least until August 19, 2025, when he was deemed competent to stand trial. Sometime thereafter, he pleaded guilty to a misdemeanor offense of theft in a case not related to the sexual assault, which had been nolled, and then released from confinement. Mr. Eden returned to the property for the first time since March 28th on August 28, 2025. He was unable to gain access to

the unit because his key card no longer worked. He again returned to the property on September 2, 2025, and he was given a barring notice.

On or about March 12, 2025, DC Housing Authority sent Mr. Eden a notice of violation of the terms of his housing voucher. That notice gave him 35 days to request a hearing. Mr. Eden claims he did not receive the notice. But even if he did, the 35 days had not run by the time of his arrest on March 28, 2025. Defendants received a copy of the notice of violation.

On May 8, 2025, Defendants entered the apartment due to a reported cockroach infestation. They found the apartment in complete disarray: cockroaches, dishes in the sink, no furniture except a bed, empty food containers, and no food in the refrigerator. Defendants began the process of remediating the apartment.

On July 17, 2025, Defendants received notice that Mr. Eden's voucher had been terminated retroactive to April 16, 2025, as he had not requested a hearing on the notice of termination. It is as of this date that Defendants claim Mr. Eden abandoned the residence. Seven days later, on July 23, 2025, Defendants posted a notice of abandonment inside the apartment entrance door. The letter provided notice that Defendants would change the locks and retake possession of the apartment on July 30, 2025, if Mr. Eden failed to respond to the notice. Mr. Eden remained confined at St. Elizabeth's at this time, and he did not respond by July 30, 2025.

Meanwhile, Defendants were attempting to evict Mr. Eden from the residence. Defendants had either five or six active eviction actions against Mr. Eden in the Landlord Tenant Branch of the DC Superior Court in the summer of 2025. One of those cases apparently had reached a point where it was ready to be scheduled for a trial. Mr. Eden had counsel in these cases, and he communicated to counsel for Defendants that Mr. Eden was involuntarily at St. Elizabeth's.

- On June 17, 2025, he wrote in an email to Defendants' counsel: "Just a heads-up, Mr. Eden is still in the hospital. I expected him to be discharged a few weeks ago, but from what I've heard, he is still there."

- On July 25, 2025, at a remote hearing in one of the pending cases, Mr. Eden's counsel advised the court and Defendants' counsel, in response to a question about moving forward with the case: "I'm not exactly sure how to answer, Your Honor, given that there is field of law at play that I don't have any experience in and can't offer a good predictive model."

- Then, on Aug. 1, 2025, counsel responded to an email about attending a case conference, "if you want to include Mr. Eden, I'm happy to do so, but in that case we'd need to ask the court for a continuance—he remains in the hospital."

Notably, at no point did Defendants' counsel advise Mr. Eden's attorney that they had determined Mr. Eden had abandoned the premises. The notice was posted on July 23, 2025, yet at no point after that—including before the trial judge two days later—did Defendants advise counsel or the court of that position.

Mr. Eden filed this action in DC Superior Court on September 1, 2025, alleging that Defendants had wrongfully evicted him in violation of DC law and seeking immediate restoration of his interest as a lessee, including allowing him back into the residence. Defendants then removed the action to this court on that same day. The court orally denied the motion for a TRO on September 5, 2025, and set September 10, 2025, for an evidentiary hearing on a motion for preliminary injunction.

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation

3

marks and citations omitted). A court may grant the "extraordinary remedy ... [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." Id. at 20 (citations omitted).

It remains an open question whether the sliding-scale approach that the D.C. Circuit adopted long ago still applies, but the court does not dwell on that issue. It evaluates each of the four factors. The Circuit has said that the likelihood of success is the most important of these factors, and the Supreme Court has noted that an injunction cannot issue absent a showing of irreparable harm. So, both of those factors must be present to secure injunctive relief.

Defendant contends that the court should apply a "heightened" preliminary injunction standard because the relief requested here would change the status quo—what Defendant terms a "mandatory injunction." As I read Circuit precedent, the DC Circuit has rejected such a heightened standard for "mandatory injunctions" but instead has relied on the traditional four factors as sufficient to evaluate the propriety of injunctive relief.

In *Singh v. Berger*, 56 F.4th 88, 96 (DC Cir. 2022), the court observed that "courts are institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the non-movant ultimately wins on the merits." It continued: "Although the Government did not ask the district court or this court at the motion stage to apply a heightened standard for preliminary relief, many of our sister circuits have adopted more stringent criteria for injunctions that alter the status quo or grant irreversible relief." (citing cases).

4

"While we believe that, on the record before us, Plaintiffs would prevail under any of those heightened tests for a preliminary injunction, we decline to reformulate the traditional test set out by the Supreme Court in *Winter*, which considered preliminary injunctive relief aimed at the military. Instead, *Winter* shows that the established test for preliminary relief is sufficiently flexible to take account of all the concerns implicated by the nature of the relief sought here. . . . Properly understood, 'public consequences [of] employing the extraordinary remedy of injunction[,]' *Romero-Barcelo*, 456 U.S. at 312, necessarily include the risk that the relief requested will cause unusual disruption if granted in error, for example by disturbing the status quo in a way that cannot readily be undone."

More recently, in *Hanson v. DC*, 120 F.4th 223, 247 (DC Cir. 2024), the court, quoting from *Singh*, emphasized the need for greater wariness when a preliminary injunction would disrupt the status quo, rather than preserve the status quo, especially if that relief cannot be undone.

The court has taken these principles into consideration. I would note at this juncture that although the relief sought would change the status quo in the sense it would restore Plaintiff back to residing in the property, it is not irreversible as Plaintiff could simply be ordered removed from the premises if he were ultimately to lose on the merits.

Likelihood of Success

The parties agree that, under D.C. law, landlords do not have a common law right of self-help and, to reacquire possession of a property, must follow the summary procedure provided by statute, which requires the landlord to seek relief in the DC Superior Court. There is no dispute here that Defendants did not follow the statutory route, as they withdrew all their pending eviction suits against Plaintiff. The only question then is whether they properly determined that Plaintiff had abandoned the premises. Plaintiff is substantially likely to prevail on that disputed issue.

5

Under DC law, an abandonment occurs "when a tenant leaves the premises vacant with the avowed intention not to be bound by his lease." *Simpson v. Lee*, 499 A.2d 889, 894 (DC 1985). Or, put differently, "'abandonment' is defined to mean 'vacating property with the intention of not returning.'" *Saul Subsidary II Ltd. P'ship v. Venator Grp. Specialty, Inc.*, 830 A.2d 854, 861 (DC 2003). Abandonment, as distinct from vacating a premises, therefore requires a specific intent to relinquish and an external act by which such intention is carried into effect. *Id.*

Here, the overwhelming evidence is that Mr. Eden either had the specific intent to relinquish the residence nor committed some external act to manifest such intention. At no point did Mr. Eden ever indicate, during his confinement at St. Elizabeth's, that he did not intend to return to the premises upon his release. To the contrary, Mr. Eden conveyed just the opposite, as he retained counsel who on Mr. Eden's behalf challenged each of Defendants' efforts to evict him through the statutorily prescribed process. Further evidencing his lack of intent to abandon is the fact that Mr. Eden returned to the property immediately upon his release from St. Elizabeth's, with the evident belief that he was entitled to reoccupy the premises. Mr. Eden also filed suit for wrongful eviction days after being denied access to the residence.

Defendants largely rely on Mr. Eden's absence from the property for 3.5 months and the horrid condition of the property. They also note that Mr. Eden failed to contest the notice of violation issued by the DC Housing Authority, resulting in its revocation. But while these facts may establish that Mr. Eden vacated the apartment, they don't amount to abandonment. After all, Mr. Eden was involuntarily confined at St. Elizabeth's. He could not return to the property. The property's putrid condition was a direct result of the restraint of his freedom. As for the termination of his voucher, that too is not evidence of abandonment, as he was detained before the 35-day response period expired, and his diminished mental health condition likely contributed to his

6

failure to timely respond. Once released from St. Elizabeth's, Mr. Eden immediately sought restoration of his voucher.

Defendants cannot plead ignorance to these circumstances. They do not dispute that Mr. Eden's counsel kept them apprised of Mr. Eden's whereabouts and thus he inability to return to the premises. Further, Defendants acted strategically by not notifying Mr. Eden's counsel of the abandonment notice, which Mr. Eden had no prospect of seeing given his confinement. One can reasonably infer that Defendants withheld such notice from counsel because they knew he would advise them that Mr. Eden had every intention to return to the residence.

The DC Court of Appeals' decision in *Simpson v. Lee* is instructive. There, the lessee failed to respond to the landlord's notice that he intended to repossess the property. The court held that that such failure could not be taken as abandonment when it was unclear whether the lessee had received the letter and the landlord knew the lessee intended to operate a business on the premises. The lessee responded to the repossession letter three months after it issued. In those circumstances, the court held, the lessee had not abandoned the property. Similar circumstances are present here. Neither Mr. Eden nor his counsel received notice of Defendants' repossession of the premise, so that fact that he did not timely respond cannot be taken as abandonment. In fact, Mr. Eden acted far more quickly upon learning about the repossession than did the lessee in *Simpson*.

So, for all of these reasons, the court finds that Mr. Eden has demonstrated a substantial likelihood of success on his unlawful eviction claim.

<u>Irreparable Harm</u>

The D.C. Court of Appeals has largely recognized that the wrongful eviction of a tenant constitutes irreparable harm. That is the lesson of *Akassy v. William Penn Apartment Ltd. P'ship*, 891 A.2d 291 (DC 2006). In that case, the plaintiff challenged his eviction. The court held that a

7

stay of the eviction was warranted, in part because the denial of a stay would cause irreparable harm. Although the parties in that case did not dispute "that the tenant would suffer irreparable harm if evicted," the court approvingly cited to courts that "have so determined." The court concluded: "The upheaval of the tenant from his home, even if he can find alternative housing, creates a cognizable irreparable harm." *Id.* at 309.

To be sure, Mr. Eden in this case does not seek to prevent his removal from the residence; he already has been removed. But the harm is no different. Absent injunctive relief, Plaintiff will be dispossessed of the apartment that he leased and is legally entitled to occupy. The consequences of not granting relief to Mr. Eden are dire. He will be forced to find alternative accommodations, either at a youth hostel, which he says he can afford for another week; a homeless shelter; or on the street. Those are not palatable options. The harm is compounded because Defendants have said they are in the process of re-letting the apartment. If they were to do so, a third-party can occupy it, and if Mr. Eden ultimately were to prevail, such circumstances would make it exceedingly difficult to reinstate him to the premises. The DC Court of Appeals found comparable circumstances to constitute irreparable harm in *Simpson v. Lee*, 499 A.2d at 896.

Hardship to Defendants and Public Interest

Although hardship to Defendants and the public interest are separate inquiries, the court addresses them together because they largely turn on the same issue: the threat that Mr. Eden poses to the residents and staff of Station House. The court shares those concerns. Mr. Eden's pattern of erratic, threatening, and harassing behavior—including possible criminal conduct—creates some risk for Defendants, their staff, and residents. But those risks do not carry the day for a number of reasons.

*First*, Defendants should not be able to secure the relief they seek through equitable considerations instead of the statutorily mandated process, which they abandoned. Relatedly, the public has an interest in seeing any ejectment of Mr. Eden done through the Landlord Tenant Branch, as required by statute.

*Second*, placing Mr. Eden back in the tenancy does not preclude Defendants from seeking to evict him for past transgressions, including unpaid rents. At present, Mr. Eden has no means of paying rent, as his housing voucher has been rescinded. He has initiated a process to try an undo that recission. And the first step in that process is happening within two weeks. If Mr. Eden fails to restore his voucher, Defendants will have a strong hand in securing his eviction for failure to pay rent.

*Third*, Mr. Eden has agreed, as a condition of the injunction to abide by certain behavioral conditions. If he violates a condition, it could result in this court withdrawing the injunctive relief. Such restrictions will provide some degree of protection to the staff and residents of Station House.

There is one additional separate consideration in the hardship calculus: the risk that, if Defendants were to ultimately prevail, Defendants will not be paid rent for the time Mr. Eden is in the apartment. That is a possibility, as Mr. Eden's voucher is suspended at present and he apparently has little to no funds to pay rent. Although the court does not dismiss the loss of rental income, Defendant is a large company that, as the court understands, owns and operates many residential properties. The loss of rents from Mr. Eden while this suit plays out will not materially impact Defendants' finances. Nor is that consequence indefinite. As noted, Defendants can move to evict Mr. Eden for past transgressions or for failure to pay rent, if he is unsuccessful in reacquiring his voucher.

Conclusion

In summary, Mr. Eden has carried his burden of establishing a substantial likelihood of success and irreparable harm absent a grant of injunctive relief. Defendant has shown that it is likely to incur some hardship if Mr. Eden were to return, including loss of rents, and that its staff and residents would once more be exposed to his erratic and harassing behavior, but those features do not outweigh Mr. Eden's success on the first two most important factors. Further, the weight of those concerns is diminished for some of the reasons discussed, including the public's interest in the proper application of the law and conditions placed on Mr. Eden's conduct that, if violated, could result in this court withdrawing the preliminary relief. The court therefore will grant preliminary relief subject to those conditions.

Security

Under Rule 65(c) of the Federal Rules of Civil Procedure, "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The language "in such sum as the court deems proper" has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. US*, 169 F.3d 21, 33 (DC Cir. 1999).

Wright & Miller § 2954, which discusses Rule 65(c)'s security requirement, recognizes that courts have properly exercised discretion in imposing a nominal bond or no bond in cases where the plaintiff is indigent. The court will impose a $100 nominal bond.

Defendants' risk of harm is capped in the sense that Defendants will know in short order whether Mr. Eden will become re-eligible for his voucher. If good cause is not shown for his

failure to respond, then he will not have the ability to pay and Defendants can seek an eviction on that ground. If good cause is found, and Mr. Eden can contest the revocation, then if he prevails, then Defendant will be made whole and, if he does not, then again Defendants' loss will be limited, as it can move to evict for failure to pay rent.

Dated: September 12, 2025

Amit P. Mehta
United States District Judge